

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-2001

# United States v. Loy

Precedential or Non-Precedential:

Docket 99-3827

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"United States v. Loy" (2001). *2001 Decisions.* Paper 2.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/2

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 4, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3827

UNITED STATES OF AMERICA

v.

RAY DONALD LOY,

Appellant

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 98-cr-00089)
District Judge: Alan N. Bloch

Argued: March 9, 2000

BEFORE: BECKER, Chief Judge, NYGAARD and
GARWOOD,* Circuit Judges

(Filed January 4, 2001)

      Marketa Sims, Esq. (Argued)
      Office of Federal Public Defender
      960 Penn Avenue
      415 Convention Tower
      Pittsburgh, PA 15222

Attorney for Appellant

---

*Honorable Will L. Garwood, United States Cir cuit Judge for the Fifth
Circuit, sitting by designation.

Bonnie R. Schlueter, Esq.
Mary Beth Buchanan, Esq. (Argued)
Office of United States Attorney
633 United States Post Office &
 Courthouse
Pittsburgh, PA 15219

Attorneys for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

Ray Donald Loy is currently serving a 33-month term of imprisonment following his conviction for receiving and possessing child pornography. After being r eleased from prison, he will be required to serve thr ee years of supervised release, subject to several special conditions, two of which are at issue in this appeal. Thefirst condition prohibits Loy from possessing "all for ms of pornography, including legal adult pornography." The second condition bars Loy from having unsupervised contact with minor children, and further specifies that the r equisite supervision must come from someone other than his wife. Loy challenges these conditions, arguing that the pornography condition is vague and overbr oad, and that the condition restricting contact with minors is not only vague and unsupported by the record, but could also potentially inhibit Loy's ability to have and raise his own children, in violation of his rights of pr ocreation and familial integrity.

At the threshold, we must address the government's contention that Loy's challenge to the pornography condition should not be addressed befor e an attempt has been made to enforce its terms. W e disagree, holding that the challenge is properly made at this time. W e therefore turn to the merits of Loy's arguments, and conclude that the prohibition on pornography is unconstitutionally vague because it fails to provide any method for Loy or his probation officer to distinguish between those items that are merely titillating and those items that are

2

"pornographic"; nor, in fact, does the prohibition even provide any guidance as to whether the r estriction extends only to visual materials, or whether purely textual works and sound recordings fall within its scope. Therefore, we vacate this condition and remand to the District Court so that it may, if it so chooses, impose a new condition in accordance with the standards we set forth.

As for the restriction on contact with minors, we conclude that, although the condition might ar guably extend to Loy's own (infant) children should he sire any upon his release from prison and befor e the three-year term of supervised release ends, given the lack of evidence to suggest that such an unlikely interpretation was intended by the District Court (and the constitutional questions that such an interpretation would raise), we will construe this condition not to extend to any children that Loy might have for the brief period of time that would be involved. We also construe the condition not to extend to accidental or unavoidable contact with children, such as might occur in public arenas. So construed, we uphold the condition as written and find that it comports with statutory and constitutional requirements.

I. Facts and Procedural History

This is the second time Loy has asked us to r eview the special conditions imposed on his supervised r elease. The following facts are taken largely verbatim from our decision in Loy's first appeal. See United States v. Loy, 191 F.3d 360, 362–64 (3d Cir. 1999). Of course, we have supplemented our previous factual discussion as necessary to reflect developments that have occurr ed in the interim.

In 1997, the United States Postal Inspection Service and the Pennsylvania State Attorney General's Office conducted a joint undercover child pornography investigation. As part of that investigation, Special Agent Dave Guzy of the Attorney General's Office placed an advertisement in a sexually explicit magazine that, in a roundabout way, invited readers to trade pornographic materials involving children. The advertisement directed inter ested parties to respond in writing to Postal Inspector Thomas Kochman,

3

although Kochman's affiliation with the Inspection Service obviously was not disclosed. On March 6, 1997, Ray Donald Loy wrote to Kochman indicating that he and his wife, Maria, both collected child pornography, and expressing an interest in trading tapes. Loy stated that if Kochman was serious about trading, he should call Loy so that they could discuss it over the telephone.

On March 17, 1997, Kochman monitored and r ecorded a call placed by Guzy to Loy. During that conversation, Loy gave detailed descriptions of some of the tapes in his collection, and told Guzy that he could "put together" tapes for trading. He also represented that he traded with many people and offered to give Guzy their names. Loy described how he had produced videos by hiding a camcor der in his bag and filming up the skirts of young girls as they rode the escalators at a mall, and, in the course of the conversation, Loy specified that he was interested in r eceiving material involving girls ranging from age eight to age thirteen. He specifically requested that Guzy send him a tape of girls between the ages of eight and ten in a bathtub ("Bath Time video"), which Guzy agreed to do. On April 28, 1997, Kochman received a letter from Loy bearing the return address of R. Loy, P.O. Box 114, Langeloth, Pennsylvania 15054. Again, Loy asked that the Bath Time video be sent to him. In exchange, Loy offered to send a video of twelve- and thirteen-year-old children engaged in sexually explicit conduct.

On May 6, 1997, Postal Inspector Thomas Clinton delivered the package containing the Bath T ime video to Loy's post office box in Langeloth and observed Loy accept delivery of the package. Other agents maintained surveillance of Loy as he left the post office and returned home with the package. Loy was observed entering his residence with the package in his possession. Clinton then executed a previously obtained search warrant, seizing from Loy's residence the Bath Time videotape as well as another tape depicting child pornography, fifteen computer disks containing child pornography, fifty videocassettes, several pornographic magazines, a VCR, and a television set. Clinton also seized various letters describing Loy's solicitation of child pornography and his of fers to trade such materials.

4

In September 1998, Loy pled guilty to one count of knowingly receiving child pornography thr ough the United States mail in violation of 18 U.S.C. S 2252(a)(2). He had also been indicted on one count of violating S 2252(a)(4)(B). At the time, Section 2252(a)(4)(B) made it a crime to knowingly possess: (1) three or more items; (2) containing visual depictions; (3) produced using materials transported in interstate and foreign commerce; (4) if production of the materials involved the use of minors engaging in sexually explicit conduct. See 18 U.S.C.A. S 2252(a)(4)(B) (West 1997). Prior to entering his plea, Loy had challenged the S 2252(a)(4)(B) count by filing a motion to suppress the evidence on which it was based. The District Court denied the motion, and Loy then entered a conditional guilty plea on the S 2252(a)(4)(B) count that preserved his right to appeal from the denial.

The District Court sentenced Loy to a 33-month ter m of imprisonment, followed by three years of supervised release. Additionally, the court imposed special conditions on Loy's supervised release, requiring him, inter alia, to undergo testing and treatment for drug and alcohol abuse, prohibiting him from having unsupervised contact with minors, and forbidding him from possessing por nography of any type. Loy objected to these special conditions, arguing that they were not supported by the recor d and that they violated his fundamental rights. In the first appeal, we upheld the denial of Loy's motion to suppress and the condition requiring drug testing, but r emanded the case to the District Court to state its reasons why the remaining conditions had been imposed. See Loy, 191 F .3d at 369-71.

Following remand, the District Court enter ed an order amending Loy's sentence to eliminate the condition that he undergo testing and treatment for alcohol abuse while on supervised release. The court then reimposed the conditions barring Loy from possessing por nography of any type, as well as from having any unsupervised contact with minors, adding the further requirement that any supervision must come from someone other than his wife. In reimposing these conditions, the court explained that because "it is sometimes impossible to dif ferentiate between children and adults in pornographic materials," the former

5

condition was necessary to protect childr en who are victimized in child pornography as well as to deter Loy from further criminal conduct or from attempting to obtain illegal child pornography. The latter condition was imposed to protect the minors with whom Loy might come into contact, and to deter Loy from attempting to cr eate "sexually explicit depictions of children." Loy now appeals for a second time, from an amended judgment of sentence entered in the District Court for the W estern District of Pennsylvania. The District Court had jurisdiction pursuant to 18 U.S.C. S 3231, which grants the district courts jurisdiction over all offenses against the laws of the United States. We have jurisdiction to review the District Court's final order pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742(a).

II. Standard of Review

A sentencing court's decision to impose conditions of supervised release is reviewed for abuse of discretion. See United States v. Loy, 191 F.3d 360, 370 n.7 (3d Cir. 1999) (citing United States v. Crandon, 173 F .3d 122, 127 (3d Cir.), cert. denied, 120 S. Ct. 138 (1999)). A condition is within the court's discretion if two criteria are met. First, the condition must be reasonably related to the factors set forth in 18 U.S.C. S 3553(a)(1) & (2)(B)-(D). Accordingly, in imposing conditions of supervised release, the sentencing court may consider: (1) the nature and cir cumstances of the offense and the history and characteristics of the defendant; and (2) the need for the condition to deter future criminal conduct, protect the public, and pr ovide the defendant with necessary training, medical car e, or other correctional treatment. See 18 U.S.C. S 3553(a)(1) & (2)(B)-(D); see also Loy, 191 F.3d at 370.

Second, a condition must involve no greater deprivation of liberty than is reasonably necessary to achieve the deterrence, public protection and/or corr ectional treatment for which it is imposed. See 18 U.S.C. S 3583(d)(2). Further, a condition that restricts fundamental rights must be "narrowly tailored and . . . dir ectly related to deterring [the defendant] and protecting the public." Crandon, 173 F.3d at 128.

6

III. The Challenge to the Pornography Prohibition

A. Justiciability

Before reaching the merits of Loy's claim, we must address the government's contention that Loy's challenge to the pornography proscription is not justiciable. The government advances several arguments on this score, implicating both the ripeness doctrine and standing considerations. Relying on United States v. Thomas, 198 F.3d 1063, 1065 (8th Cir. 1999) (holding that a prisoner's challenge to a condition of supervised release was premature because he would "not be subject to the condition for nearly a decade, during which time any number of events may occur that would make the condition irrelevant"), the government explains that, inter alia, an incarcerated prisoner may no longer have the same interest in engaging in the prohibited activity upon r elease from prison, and further, that vagueness challenges to conditions of supervised release are prematur e until those conditions have been interpreted by a probation officer. The government now asks that, "[a]s a matter of judicial policy," we refrain from entertaining due pr ocess challenges to conditions of supervised release prior to a violation of those conditions. Although the government avoids the words, it essentially asks us to hold that Loy's challenge fails to meet the prudential aspects of ripeness.

Additionally, in recommending that we adopt a judicial policy of refusing to hear due process challenges to unenforced conditions of release, the government also relies on the standing requirements typically necessary to mount vagueness challenges to statutes that do not infringe constitutionally protected rights. Thus, citing Parker v. Levy, 417 U.S. 733 (1974), the government has argued that because vagueness challenges may typically only be made in the context of particular purported violations, Loy must wait until he is facing revocation proceedings before he will be able to raise his claim. We will addr ess each of these arguments in turn, ultimately holding that Loy's claim is not only justiciable, but, in fact, consideration at this time promotes judicial efficiency and is in keeping with the

7

demonstrated congressional intent that sentences be
reviewed on direct appeal.

1. Ripeness

In United States v. Stine, 646 F.2d 839 (3d Cir. 1981),
this Court held that a defendant who failed to appeal a
probation condition at the time it was enter ed against him
was barred from lodging a facial attack on the condition as
a defense in a revocation proceeding. See id. at 846-47. In
so doing, we observed that "the federal courts have
uniformly permitted defendants sentenced to probation to
challenge the validity of their probation conditions on direct
appeal." Id. at 846 n.16. In United States v. Ofchinick, 937
F.2d 892 (3d Cir. 1991), we reaffirmed Stine, holding that a
challenge to a condition of supervised release mounted
immediately after the sentence met the Article III test for
ripeness. Our holding in Ofchinick was based in part on the
fact that, if the defendant waited until revocation
proceedings to challenge the condition, he would likely be
found to have waived his right to object. See id. at 897. In
that case, we characterized as "illogic[al]" the government's
position that a probationer must risk incar ceration in order
to challenge a condition. See id. at 897 n.5.

Although helpful in guiding our approach to the issue,
these cases do not explicitly address the "prudential"
ripeness doctrine. That doctrine is intended to"prevent the
courts . . . from entangling themselves in abstract
disagreements over administrative policies, and also to
protect the agencies from judicial inter ference until an
administrative decision has been formalized and its effects
felt in a concrete way." Abbott Labs. v. Gardner, 387 U.S.
136, 148 (1967). In determining whether a claim is ripe, a
court must look at: (1) "the hardship to the parties of
withholding court consideration"; and (2) thefitness of the
legal issue for judicial review. Id. at 149; see also Artway v.
Attorney General of N.J., 81 F.3d 1235, 1247 (3d Cir. 1996).
In view of the government's contentions, we analyze this
case in terms of these elements of the prudential ripeness
doctrine.

a. Hardship to Parties

The essence of Loy's claim is that not knowing the scope
of the pornography proscription is, in itself, a hardship. He
argues that because of the vagueness, he will not know
what he can and cannot view. If, as the gover nment argues,
he must wait until he is arrested to lear n whether or not he
has violated the condition, the hardship to him is apparent.
As we held in Pennsylvania Department of Public Welfare v.
United States Department of Health & Human Services , 101
F.3d 939 (3d Cir. 1996), the fact that a party may be forced
to alter his behavior so as to avoid penalties under a
potentially illegal regulation is, in itself, a hardship. In so
doing, we opined that an argument to the contrary would
be

> like saying that an increase in the inter est rate charged
> for late payments on a credit card pr esents no
> hardship to the customer because the customer has
> not yet made a delayed payment under the new and
> higher interest rate. We disagree with that premise.
> Instead, we think it more likely that the customer will
> have to change his behavior at the time he is infor med
> of the rate hike in order to avoid the risk of having to
> pay the higher interest rate and hence will suf fer a
> direct hardship at the time of the rate hike. The fact
> that the new, higher interest rate is a contingent future
> charge does not preclude it from causing harm to the
> party at the time it is put into place.

Id. at 946.

In addition, the government's blanket r equirement that
Loy face revocation proceedings befor e being permitted to
challenge his conditions of release is at odds with the
Supreme Court's pronouncement in Stef fel v. Thompson,
415 U.S. 452 (1974), where the Court stated that "it is not
necessary that petitioner first expose himself to actual
arrest or prosecution to be entitled to challenge a statute
that he claims deters the exercise of his constitutional
rights." Id. at 459.

b. Fitness for Judicial Review

An examination of the "fitness for judicial r eview" of a
particular claim requires that a court look at the nature of

the question presented. Therefore, we will examine "whether or not the question is purely legal and easy to resolve." Pennsylvania Dep't of Pub. W elfare v. United States Health & Human Servs., 101 F.3d 939, 945 (3d Cir. 1996). As we have said, "[t]he more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." Artway v. Attor ney General of N.J., 81 F.3d 1235, 1249 (3d Cir. 1996).

In this case, the question is purely one of law: whether the pornography proscription is unconstitutionally vague and does not provide Loy with sufficient notice of what he may do. Nothing about this contention will change between now and the time when he is released fr om prison. The government would prefer that we addr ess Loy's challenge in the context of a particular magazine or other publication (an argument that has the perverse quality of asking us to refuse to rule on Loy's vagueness challenge because the condition is too vague to analyze). Although such contextual grounding would indeed allow us to determine whether or not the particular publication at issue fell within the condition, it would not in any way assist in the more general analysis of whether the condition pr ovides Loy with sufficient warning to "know what is pr ohibited, so that he may act accordingly" in his day-to-day activities. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The government's approach would have Loy discover the meaning of his supervised release condition only under continual threat of reimprisonment, in sequential hearings before the court. Such an exercise is not necessary, nor will it clarify the issues.

c. Congressional Intent

In Abbott Laboratories, the Supreme Court held that congressional intent is an important component of the prudential ripeness inquiry. See Abbott Labs. v. Gardner, 387 U.S. 136, 139-40 (1967). The legislative history of the Sentencing Reform Act of 1984 evidences Congr ess's intention that direct appellate review be the preferred method of reviewing a district court's sentence. See S. Rep. No. 98-225, at 151 (1984), reprinted in 1984 U.S.C.C.A.N.

3182, 3334 (noting, in the context of a discussion of procedures for direct appellate r eview of sentences, that "most Western nations . . . consider review at the behest of either the defendant or the public to be a fundamental precept of a rational sentencing system, and the Committee considers it to be a critical part of the foundation for the bill's sentencing structure"); id. at 154, reprinted in 1984 U.S.C.C.A.N. at 3337 ("The Committee intends that a sentence be subject to modification through the appellate process. . . ."). Section 3742 of Title 18 of the United States Code, which allows for appellate review of sentences, was added in 1984 as part of the congressional scheme to ensure greater uniformity in sentencing. See S. Rep. No. 98-225, at 150, reprinted in 1984 U.S.C.C.A.N. at 3333. This change from the previous regime, which provided for no such review, demonstrates the extent to which Congress felt that the appellate process was an integral part of the formulation of the sentence. Cf. id. at 151, reprinted in 1984 U.S.C.C.A.N. at 3334 ("Appellate review of sentences is essential to assure that the guidelines ar e applied properly and to provide case law development of the appropriate reasons for sentencing outside the guidelines. This, in turn, will assist the Sentencing Commission in refining the sentencing guidelines. . . ."). Thus, the legislative history of the current sentencing scheme demonstrates Congress's intention that appellate courts consider the legality of conditions of supervised r elease at the time of their imposition, rather than only in the context of an appeal from a revocation proceeding.

2. Standing

The government alternatively contends that Loy does not have standing to raise his claim, on the ground that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Parker v. Levy, 417 U.S. 733, 756 (1974). The government submits that Loy cannot be heard until the condition has been applied to his specific conduct. However, there ar e crucial differences between the context in which Loy presents his challenge and the contexts in which the traditional standing requirements for vagueness challenges wer e developed.

11

A typical vagueness challenge is brought as a defense to a criminal charge, and can only be raised by a defendant whose own conduct arguably did not fall within the terms of the statute, thus allowing the defendant to claim that the lack of fair notice led to a deprivation of liberty without due process of law. See, e.g., United States v. National Dairy Prods. Corp., 372 U.S. 29, 32–33 (1963) ("Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. In determining the sufficiency of the notice a statute must of necessity be examined in light of the conduct with which a defendant is charged." (citations omitted)). A defendant whose conduct is at the "core" of the activities clearly covered by the statute's terms may only raise a vagueness defense if the statute is one that is likely to chill the exercise of constitutionally protected conduct. See United States v. Mazurie, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand.").[1] Vagueness claims are therefore subject to different standing requirements depending on the nature of the statute or rule under attack.[2]

As a convicted felon sentenced to a term of supervised release, Loy's constitutional rights do not have the same

_____

1. See also Kolender v. Lawson, 461 U.S. 352, 359 n.8 (1983) (holding that facial vagueness challenges are permissible where "a law reaches a substantial amount of constitutionally protected conduct" (citation omitted)); Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494–95 (1982) (noting that, if a statute "implicates no constitutionally protected conduct," a preenforcement challenge can succeed on vagueness grounds only if the statute is "impermissibly vague in all of its applications"); Young v. American Mini Theatres, Inc., 427 U.S. 50, 59–60 (1976) ("[I]f the statute's deterrent effect on legitimate expression" is "real and substantial," parties may challenge the statute "even though there is no uncertainty about the impact . . . on their own rights.").

2. When a statute is vague and arguably involves protected conduct, vagueness analysis will necessarily intertwine with overbreadth analysis. See Hoffman Estates, 455 U.S. at 494 n.6 ("[A] court should evaluate the ambiguous as well as the unambiguous scope of the enactment. To this extent, the vagueness of a law affects overbreadth analysis.").

scope as those of ordinary persons. See United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 & n.14 (9th Cir. 1975) (observing that "probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free" and that "[m]erely because a convicted individual's fundamental rights ar e involved should not make a probation condition . . . automatically suspect"). In evaluating constitutional challenges to probation conditions, we have upheld conditions that are "directly related to deterring [the offender] and protecting the public," even when First Amendment inter ests are at stake. United States v. Crandon, 173 F .3d 122, 128 (3d Cir.), cert. denied, 120 S. Ct. 138 (1999). The government, asserting that in the context of supervised r elease there is no "protected" conduct to chill, asks us to apply the more stringent standing rules to Loy's vagueness and overbreadth challenge, requiring him either to mount his challenge in the context of a particular purported violation so that we can assess whether the condition is vague or overbroad with respect to that violation, or, presumably, to demonstrate that the condition is vague in all of its applications. But the government fails to r ecognize there are important differences between a probationer on supervised release and a member of the general public that affect the standing analysis.

To begin with, a defendant charged with violating a release condition, unlike a defendant char ged with violating a statute, does not enjoy "the full panoply of rights" normally available in a criminal proceeding. Morrissey v. Brewer, 408 U.S. 471, 480 (1972). For instance, defendants in revocation proceedings face a lower standard of proof, see 18 U.S.C. S 3583(e) (permitting revocation if a court finds, by a preponderance of evidence, that a condition has been violated); a greater range of evidence that may be admissible against them, see United States v. Bazzano, 712 F.2d 826, 829 (3d Cir. 1983) (en banc) (per curiam) (no exclusionary rule in revocation proceedings); United States v. McCallum, 677 F.2d 1024, 1026 (4th Cir . 1982) (permitting hearsay evidence in revocation proceedings); a lack of a jury right, see Gagnon v. Scarpelli , 411 U.S. 778, 789 (1973); and no right against self-incrimination, see United States v. Conte, 99 F.3d 60, 66 (2d Cir. 1996). The

13

fewer procedural protections available at a revocation proceeding, as opposed to a trial, make it far more hazardous for a releasee to wait until a condition has been enforced in order to test its validity.

Secondly, persons under conditions of supervised r elease are presumably more likely to be"prosecuted" for their violations--these conditions are, after all, special "laws" tailored only to them. Loy, as a felon on supervised release, is in far more danger as the peculiar tar get of a "law" applicable only to him than he would be as a member of the general public mounting a challenge to a law that might never be applied to his conduct. Cf. Poe v. Ullman, 367 U.S. 497, 501 (1961) (plurality opinion) (refusing to entertain, on prudential justiciability grounds, a challenge to Connecticut's ban on the use of contraceptives, observing that "[d]uring the more than thr ee-quarters of a century since [the law's] enactment, a prosecution for its violation seems never to have been initiated" except in a single instance).

Further, because the condition is unique to Loy, there is no likelihood of a general groundswell of support for a change in the "law." Therefore, limits on standing that have been advanced in cases like United States v. Richardson, 418 U.S. 166, 175 (1974) (no "taxpayer standing" to challenge a statute mandating that CIA expenditur es be kept secret), on the ground that "generalized grievances" are more appropriately addressed through the political process, are inapplicable to challenges to conditions of supervised release. And because the condition is applicable only to Loy, there is no chance that an "enforcement policy" will provide guidance as to the condition's contours. Hoffman Estates, 455 U.S. at 502.

On a broader level, it should be remember ed that all of the justiciability doctrines--standing, ripeness, and mootness--stem in part from a desire to allow the other branches of government to engage in their nor mal process of lawmaking before invoking the judicial power to stop such efforts in their tracks. For instance, in Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), the Supreme Court explained that the ripeness doctrine in part serves to "protect the agencies from judicial interference until an

14

administrative decision has been formalized." Id. at 148. Similarly, in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), the Court held that the citizen-suit pr ovisions of the Endangered Species Act, which conferred standing on "any person" to sue United States instrumentalities to force compliance with the Act, represented an unconstitutional attempt by Congress to breach the separation of powers by policing the activities of the Executive branch. See id. at 576-77; see also Poe, 367 U.S. at 503 ("In part [the justiciability rules] derive from the fundamental federal and tripartite character of our National Government and from the role--restricted by its very r esponsibility--of the federal courts . . . within that structure.").

In the context of the supervised release, however, the condition applicable to a particular prisoner--that is, the "law" being challenged--is created by the judiciary, within the jurisdictional boundaries set by Congress. No protection is accorded other divisions of government when we stay our hand; in fact, by doing so, we actively impede the proper process of lawmaking. Congress has entrusted the responsibility for formulating appr opriate conditions of release to the judiciary, and has provided specific statutory permission for offenders to obtain appellate review of their sentences at 18 U.S.C. S 3742(a). Ther efore, judicial review of criminal sentences is an integral part of the pr ocess of creating these individual "laws," and just as legislation is only enacted pursuant to bicameralism and pr esentment, see INS v. Chadha, 462 U.S. 919, 954-55 (1983), so too criminal sentences are formulated in part through the appellate process. To refuse to r eview such a condition would be to impede this process of judicial lawmaking.

3. Judicial Efficiency

Our position also promotes judicial efficiency. See, e.g., Allstate Ins. Co. v. Wayne County, 760 F .2d 689, 696 (6th Cir. 1985) (holding that the ripeness inquiry includes considerations of judicial economy); Independent Bankers Ass'n of Am. v. Smith, 534 F.2d 921, 928 (D.C. Cir. 1976) (same). Loy is pursuing, as a routine matter , his appellate right to challenge a final order of the District Court. We review these conditions all the time, and, as a prudential

15

matter, it makes sense to review them at this stage. Just last year, we reviewed the conditions of a supervised release in United States v. Crandon, 173 F.3d 122, 128 (3d Cir.), cert. denied, 120 S. Ct. 138 (1999), and upheld a condition prohibiting the defendant access to the inter net after he was convicted of receiving child pornography. The government's approach merely ensur es multiple adjudications as defendants appeal parts of their sentences immediately--as, indeed, they must do under United States v. Stine, 646 F.2d 839 (3d Cir. 1981)--and parts of them later on. Cf. FTC v. Standard Oil Co., 449 U.S. 232, 242 (1980) (ripeness doctrine is intended to prevent "piecemeal review" and to ensure judicial efficiency).

## 4. Summary

Thus, (1) we have "case or controversy" jurisdiction; (2) the issues are legal ones that we can easily r esolve without reference to concrete facts; (3) the defendant will experience a hardship if we do not resolve the issues; (4) the traditional canons that counsel against hearing these sorts of challenges are inapplicable in the context of supervised release conditions; and (5) the judicial system has an interest in dealing with this case as expeditiously as possible, instead of waiting for a distinct appeal of a conviction for a violation of the conditions of r elease. Therefore, the case is ripe, and we will r each the merits of Loy's challenge.

## B. The Jurisprudence

The District Court ordered that, as a condition of his supervised release, Loy be prohibited "from possessing all forms of pornography, including legal adult pornography, in order to: (1) protect the children that are victimized in the production of child pornography; and (2) deter defendant from engaging in additional criminal conduct." Loy claims that the District Court's order is unconstitutionally vague, because "[t]he term `pornography' lacks a legal definition" and "fails to give Mr. Loy notice of which materials he may not possess."

16

The constitutional requirement that laws be reasonably precise as to the scope of prohibited conduct serves three distinct purposes:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is pr ohibited, so that he may act accordingly. . . . Second, . . . [a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis. . . . Third . . . where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms.

Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972) (internal citations and quotation marks omitted). A statute violates due process of law if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926); see also United States v. Pungitore et al., 910 F.2d 1084, 1104 (3d Cir. 1990). The same principles apply to a condition of supervised r elease. See, e.g., United States v. Schave, 186 F.3d 839 (7th Cir. 1999) (citing Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972)); LoFranco v. United States Parole Comm'n, 986 F. Supp. 796, 810–11 (S.D.N.Y. 1997).

Courts have long grappled with the problem of generating definitions to facilitate the regulation of sexually explicit materials. In 1957, the Supreme Court held that "obscene" speech is beyond the coverage of the First Amendment. See Roth v. United States, 354 U.S. 476, 485 (1957). For years afterward, the Court struggled to find a definition of "obscenity," see, e.g., Memoirs v. Massachusetts, 383 U.S. 413 (1966); Redrup v. New York, 386 U.S. 767 (1967); Kois v. Wisconsin, 408 U.S. 229 (1972) (per curiam), finally settling on the now-familiar Miller test, see Miller v. California, 413 U.S. 15 (1973). In or der for a work to fall outside the scope of the First Amendment, it must: (1) taken as a whole, according to community standards, appeal to the "prurient interest," (2) depict, "in a patently

17

offensive way," sexual conduct as defined by state law, (3) when taken as a whole, lack "serious literary, artistic, political, or scientific value." Id. at 24. "Sexually-oriented work is not obscene unless all three elements of the Miller test are satisfied." United States v. Various Articles of Obscene Merchandise, Schedule No. 2102, 709 F.2d 132, 135 (2d Cir. 1983).

The determination whether a particular work is"obscene" under the Miller test is an exacting inquiry. Though "community standards" are used to determine whether a work is patently offensive, see Smith v. United States, 431 U.S. 291, 301 (1977), a "reasonable person" standard must be used to determine whether a work lacks serious merit, see Pope v. Illinois, 481 U.S. 497, 500-501 (1987). "Prurience," for Miller purposes, does not include an appeal to "normal, healthy sexual desires," but only includes "material whose predominate appeal is to a shameful or morbid interest in nudity, sex, or excr etion," Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 498 (1985) (internal quotation marks omitted). "Sexual conduct" can include "lewd exhibition of the genitals," but a distinction must be made between exhibitions that are lewd and those that are not lewd, because "nudity alone is not enough to make material legally obscene." United States v. V arious Articles of Merchandise, Schedule No. 287, 230 F .3d 649, 657 (3d Cir. 2000) (quoting Jenkins v. Georgia, 418 U.S. 153, 161 (1974)).3 And, as we recently held, the Miller test's protection for works of serious political value "is broad enough to encompass that which might tend to bring about `political and social changes.' " Various Articles of Merchandise, 230 F.3d at 658 (holding that nudist magazines ar e not obscene because, inter alia, they "champion nudists' alternative lifestyle").

Many items that would almost certainly fall under the general rubric of "pornography" may not be captured by Miller's prongs. See, e.g., V arious Articles of Obscene

_____

3. Indeed, the panel concluded that the subjects of the nude photographs at issue in Various Articles of Merchandise were not "posed in a way `suggestive of moral looseness.' " Various Articles of Merchandise, 230 F.3d at 657.

Merchandise, 709 F.2d at 137 (upholding trial court determination that the film Deep Thr oat was not patently offensive by the community standards of New York); Penthouse Int'l, Ltd. v. McAuliffe, 610 F .2d 1353, 1373 (5th Cir. 1980) (holding that the January 1978 issue of Penthouse, but not Playboy, was obscene). In American Booksellers Association, Inc. v. Hudnut, 771 F .2d 323 (7th Cir. 1985), the court examined a statute that specifically defined the term "pornography," noted the disjunction between what is "pornographic" and what is "obscene," and struck down, on First Amendment grounds, a pr ohibition on the former but not the latter. See id. at 334.

As is demonstrated by the foregoing discussion, although the scope of the term "obscenity" has been exhaustively examined (and even the term "indecency" has been given a specific definition by the FCC, see FCC v. Pacifica Found., 438 U.S. 726, 731–32 (1978)), the term "por nography," unmoored from any particular statute, has never received a precise legal definition from the Supr eme Court or any other federal court of appeals, and remains undefined in the federal code.4 The Supr eme Court in Miller used only a footnoted dictionary reference for its own definition. See Miller, 413 U.S. at 19 n.2 (defining por nography as "a description of prostitutes or prostitution" with a secondary meaning of "a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of er otic behavior designed to cause sexual excitement" (quoting Webster's Third New International Dictionary (1969)). Further, in the context of Loy's supervised release, in or der to comport with First Amendment standards, the prohibition on pornography must be narrowly tailor ed to serve the goals of advancing Loy's rehabilitation and protecting the public. See Part II, supra.

_____

4. Although federal law contains a definition of child pornography, see 18 U.S.C. S 2256, the release condition imposed here cannot be presumed to track that statute, as the condition explicitly prohibits "legal adult pornography." Further , the condition does not limit its reach
to visual works, as does federal law.

19

C. Discussion

1. Pornography's Meaning

The word pornography is derived fr om the Greek pornographos, which meant "writing of harlots." (Porne = harlot and graphos = writing). Accor ding to the Oxford English Dictionary (1986), pornography is defined as "1. . . . a description of prostitutes or of prostitution, as a matter of public hygiene. . . . 2. Description of the life, manners, etc., of prostitutes and their patrons; hence, the expression or suggestion of obscene or unchaste subjects in literature or art; pornographic literature or art." According to Merriam-Webster's Collegiate Dictionary (1999), pornography is "1: the depiction of erotic behavior (as in pictur es or writing) intended to cause sexual excitement 2: material (as books or a photograph) that depicts erotic behavior and is intended to cause sexual excitement 3: the depiction of acts in a sensational manner so as to arouse a quick intense emotional reaction." The Funk & W agnalls New Standard Dictionary of the English Language (1941) defines pornography as "1. Description of pr ostitutes and of prostitution as related to public hygiene. 2. The expression or suggestion of the obscene in speaking, writing, etc.; licentious art or literature." The W ebster's Third New International Dictionary definition was quoted in Part III.B, supra.

Though these various definitions are instructive in a general way, they clearly lack the greater pr ecision of the Miller test for obscenity. Unlike instances of obscenity, we could easily set forth numerous examples of books and films containing sexually explicit material that we could not absolutely say are (or are not) por nographic. One such example, as discussed below, might be Playboy , which features nudity but not sexual conduct. It is also difficult to gauge on which side of the line the film adaptations of Vladimir Nabokov's Lolita would fall, or if Edouard Manet's Le Dejeuner sur L'Herbe is pornographic (or even some of the Calvin Klein advertisements), and we certainly cannot know whether the pornography condition is r estricted only to visual materials, or whether it encompasses pur e text and sound recordings. In Farrell v. Burke, No. 97 CIV.

20

5708(DAB), available in 1998 WL 751695 (S.D.N.Y. Oct. 28, 1998), the district court described a situation in which a parole condition prohibiting "por nography" was interpreted by a parole officer to apply equally to Playboy and to photographs of Michelangelo's David. Similarly, the Court of Appeals for the Seventh Circuit, examining the scope of a statutory definition of pornography, observed that it could encompass everything "from hard-cor e films to W.B. Yeats's poem `Leda and the Swan.' " American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 327 (7th Cir . 1985). Although the propriety of affixing the title "por nography" to any of these items could foster debate, the debate would r emain undecided. Put differently, with r egard to "pornography" rather than "obscenity," we do not "know it when we see it."

Additionally, as we observed in United States v. Crandon, 173 F.3d 122, 128 (3d Cir.), cert. denied, 120 S. Ct. 138 (1999), to avoid First Amendment infirmity, a probation condition must be "narrowly tailored" and "directly related" to the goals of protecting the public and pr omoting Loy's rehabilitation -- thus, the condition must not extend to all arguably pornographic materials, but only to those that fall into this subset. Even the government conceded in its supplemental brief that it does not know whether Playboy is part of this group, which is, in fact, a change from its position, taken during oral argument, that Playboy absolutely constituted "pornography." 5 Loy, then, can hardly be expected to be able to discer n, in advance, which materials are prohibited, with no mor e than the constitutional standard of permissible r estrictions to guide him. Cf. Laurence H. Tribe, American Constitutional Law (2d ed. 1988) S 12-29, at 1031 ("[T]he Constitution does

_____

5. The government argues that a condition of supervised release is akin to a prison regulation, and thus, because por nography is routinely forbidden in prisons, such a restriction can be freely applied to Loy. This
contention is patently without merit, as it flatly contradicts the Supreme Court's statement in Morrissey v. Brewer , 408 U.S. 471 (1972), that "[t]he liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. . . . Though the state properly subjects him to many restrictions not applicable to other citizens, his condition is very differ ent from that of confinement in a prison." Id. at 482.

21

not, in and of itself, provide a bright enough line to guide primary conduct, and . . . a law whose reach into protected spheres is limited only by the background assurance that unconstitutional applications will eventually be set aside is a law that will deter too much. . . .") (emphasis removed).6

For all of these reasons, the pornography condition runs afoul of the due process values that the vagueness doctrine is meant to protect, and, to the extent that Loy is likely to avoid materials that are not "dir ectly related" to the goals of rehabilitation and deterrence, the condition threatens to chill protected conduct, as well.

2. Effects of a Scienter Requir ement

The government advances the intriguing ar gument that the condition could be interpreted so as to include a salvaging scienter requirement. But this cannot solve the problem. To begin with, although pr obation or parole will usually not be revoked for unknowing violations of conditions of release, unless a scienter r equirement is explicitly written into the condition (which is not the case here), there is no way to be certain that one will be applied during revocation proceedings. This is because release can be revoked for reasons that have nothing to do with the "fault" of the offender, but instead are more related to protection of the public. See, e.g., United States v. Warner, 830 F.2d 651, 657 (7th Cir. 1987) ("If . . . probation's purposes have been frustrated, revocation is fair and appropriate even if the probationer did not willfully violate

_____

6. In United States v. Schave, 186 F .3d 839 (7th Cir. 1999), the Seventh Circuit avoided a vagueness problem in a condition of supervised release that prohibited associations with white supr emacists by construing it to encompass only those associations that "r easonably relate[d]" to the dangers against which the condition was intended to protect. Id. at 844. However appropriate such a measure may have been under the circumstances of that case, a similar construction would not save the condition here. The condition in Schave was not only more particular than Loy's (it prohibited associations with certain well-defined groups), but also was part of a long history of "associational" conditions that are so common that they have acquired something of a judicial gloss as to their scope. See Part IV, infra .

his probation conditions."); United States v. McLeod, 608 F.2d 1076, 1078 (5th Cir. 1979) (per curiam) ("A good faith attempt to comply with a probation agreement is not a controlling factor, but only one of many factors that a District Court may consider in the exercise of its discretion to revoke probation.").

Even if a scienter requirement wer e to be read into the condition, however, this construction would not save it. Though in some situations, a scienter requir ement may mitigate an otherwise vague statute, see, e.g ., Hoffman Estates v. Flipside, Hoffman Estates, Inc. , 455 U.S. 489, 499 (1982); Colautti v. Franklin, 439 U.S. 379, 395 (1978), such a requirement will not cure all defects for all purposes, see, e.g., Cramp v. Boar d of Pub. Instruction of Orange County, 368 U.S. 278, 286 (1961) (invalidating a loyalty oath on the ground that, notwithstanding the fact that the oath-taker was required only to affirm that he or she had never "knowingly" counseled or supported Communists, the oath was too vague to be reasonably understood); Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127, 138 (3d Cir. 2000) (holding that a scienter requirement cannot save a statute criminalizing "partial-birth abortion" where the definition of such a procedure is, in itself, vague); Nova Records, Inc. v. Sendak, 706 F.2d 782, 789 (7th Cir. 1983) ("A scienter r equirement cannot eliminate vagueness . . . if it is satisfied by an`intent' to do something that is in itself ambiguous."). Indeed, a contrary rule would rob the vagueness doctrine of all of its meaning, for legislatures would simply repair otherwise vague statutes by inserting the word "knowingly." See Richmond Med. Ctr. for Women v. Gilmor e, 55 F. Supp. 2d 441, 498 (E.D. Va. 1999), aff 'd on other gr ounds, 224 F.3d 337 (4th Cir. 2000).

3. Delegation of Power to the Probation Officer

The government suggests that the term"pornography" is cabined by the fact that Loy could check with his pr obation officer to gauge its applicability to a particular case. However, although there is no question that "[i]n addition to the bare words of the probation condition, the probationer may be guided by further . . . instructions . . . of the . . .

23

probation officer," United States v. Romero, 676 F.2d 406, 407 (9th Cir. 1982), the sentencing court may not wholesaledly "abdicate[ ] its judicial r esponsibility" for setting the conditions of release, United States v. Mohammad, 53 F.3d 1426, 1438 (7th Cir . 1995) (invalidating an order of restitution wher e the sentencing court allowed the probation officer to dictate the manner of payment). A condition with no core meaning beyond "whatever is necessary for Loy's rehabilitation" cannot be cured by allowing the probation officer an unfettered power of interpretation, as this would create one of the very problems against which the vagueness doctrine is meant to protect, i.e., the delegation of "basic policy matters to policemen . . . for resolution on an ad hoc and subjective basis." Grayned v. City of Rockford, 408 U.S. 104, 109 (1972); see LoFranco v. United States Par ole Comm'n, 986 F. Supp. 796, 810 (S.D.N.Y. 1997) (holding a par ole condition to be unconstitutionally vague because the pr ohibition on association with "outlaw motorcycle gangs" delegated policymaking power to the parole officer); cf. United States v. Kent, 209 F.3d 1073, 1079 (8th Cir . 2000) (invalidating a condition requiring probation officer to determine whether the defendant should undergo counseling). 7 Though it is true that "[c]ondemned to the use of wor ds, we can never expect mathematical certainty from our language," Grayned, 408 U.S. at 110, without a more definitive standard to guide the probation officer's discretion, there is a real danger that the prohibition on por nography may ultimately translate to a prohibition on whatever the officer personally finds titillating. Cf. Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971) (striking down a statute punishing assemblages of persons who conducted themselves in an "annoying" manner, on the ground that though a city may forbid certain forms of antisocial conduct, "[i]t cannot constitutionally do so through . . . an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed").

_____

7. A similar condition was imposed in this case; however, Loy has not raised any challenges to it, and so we need not addr ess the question whether this court would follow the Eighth Cir cuit reasoning regarding the propriety of conditions that allow the pr obation officer to determine whether a defendant is in need of counseling.

24

4. Conclusion

To be sure, we are dealing her e with an unusually broad condition. We in no way mean to imply that courts may not impose restrictions on the consumption of sexually explicit materials by persons convicted of sex crimes. Indeed, we do not expect that our holding today will greatly diminish a district court's discretion in imposing such conditions for the simple reason that almost any r estriction upon sexually explicit material may well aid in rehabilitation and protection of the public. Only in the exceptional case, where a ban could apply to any art form that employs nudity, will a defendant's exercise of First Amendment rights be unconstitutionally circumscribed or chilled. A probationary condition is not "narrowly tailored" if it restricts First Amendment freedoms without any resulting benefit to public safety. Here, the condition could extend not only to Playboy magazine, but also to medical textbooks. Restricting this entire range of material is simply unnecessary to protect the public, and for this reason the condition is not "narrowly tailored."

Thus, in Loy's case, to the extent that the condition might apply to a wide swath of work ranging fr om serious art to ubiquitous advertising, the condition is overly broad and violates the First Amendment. To the extent that its breadth is unclear, it is unconstitutionally vague. That said, there is no question that the District Court could, perfectly consonant with the Constitution, restrict Loy's access to sexually oriented materials, so long as that r estriction was set forth with sufficient clarity and with a nexus to the goals of supervised release. Further, the Constitution would not forbid a more tightly defined restriction on legal, adult pornography, perhaps one that clarified whether it extended non-visual materials, or that borrowed applicable language from the federal statutory definition of child pornography located at 18 U.S.C. S 2256(8).8

_____

8. The federal statute reads:

     "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--

In sum, with no guidepost for Loy, the pornography prohibition as currently written violates due process by failing to provide Loy with adequate notice of what he may and may not do, chilling his First Amendment rights in the process. The condition "forbids . . . an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).

IV. The Challenge to the Prohibition on
       Unsupervised Contact with Minors

Conditions of supervised release must be "r easonably related" to the goals of deterrence, pr otection of the public, and rehabilitation of the defendant. 18 U.S.C.S 3583(d)(1). They must also "involve[ ] no gr eater deprivation of liberty than is reasonably necessary" to meet these goals, 18 U.S.C. S 3583(d)(2), and, as stated above, supervised release conditions that affect constitutional rights will likely be valid if "narrowly tailored and . . . directly related to deterring [the offender] and protecting the public." United States v. Crandon, 173 F.3d 122, 128 (3d Cir.), cert. denied, 120 S. Ct. 138 (1999); see also United States v. Tolla, 781 F.2d 29, 34 (2d Cir. 1986) ("[C]onditions that restrict a probationer's freedom must be especiallyfine-tuned.").

Loy claims that there is insufficient evidence in the record to support the condition barring him from having

_____

      (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

      (B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;

      (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

      (D) such visual depiction is advertised, pr omoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct[.]

18 U.S.C. S 2256(8).

any unsupervised contact with minors. He further contends that the condition is "not `reasonably r elated' to the statutory goals because no evidence was presented that [he] ever molested a child." Finally, Loy argues that the condition, coupled with the requirement that the "supervision" come from someone other than his wife, functionally prevents him from bearing and raising children of his own, in violation of his fundamental rights to procreate and to maintain the integrity of his family.

The District Court's findings in support of the condition that Loy have no unsupervised contact with minors r ead as follows:

> The Court finds it appropriate to pr ohibit defendant from all unsupervised contact with minors while on supervised release. Although defendant was convicted of possession of child pornography and not of the production of such pornography, the evidence presented to this Court prior to sentencing demonstrates that the defendant has not only a significant knowledge of and interest in child pornographic materials, but also that the defendant himself has been involved in making videos of young girls. Specifically, defendant described to Special Agent Guzy how he had produced videos by hiding a camcorder in a bag and filming up the skirts of girls high school age and younger as they rode escalators at a mall, as well as how he has "hidden" camera videotapes that he made by videotaping through windows. Regardless of whether or not these videos constitute pornography, it is clear to this Court that the defendant, given his interest in child por nography and his efforts to make sexually explicit materials involving children, poses a danger to childr en if left alone with them.

> Accordingly, the Court finds it appr opriate to prohibit defendant from having unsupervised contact with minors. The Court does not mean by imposition of this condition to require that defendant's pr obation officer or another law enforcement official be pr esent whenever defendant is around minors. However , defendant is not to be alone with minors, nor is he to

27

be alone with his wife and any minors. In other words, an adult other than defendant's wife must be present when defendant is in the presence of a minor. This condition of supervised release serves to: (1) protect minors who may come in contact with defendant in that defendant is not likely to attempt to make sexually explicit depictions of them if another adult is present; and (2) deter defendant from engaging in criminal conduct, also because defendant is not likely to attempt to make sexually explicit depictions of children if another adult is present.

In a footnote, the court explained that "[e]vidence presented to this Court prior to defendant's sentencing indicated that defendant's wife also has an interest in child pornography."

Loy argues that the District Court's findings with respect to this condition are not supported by the record. We disagree. As the court noted, Loy twice admitted to an undercover agent that he secretly filmed up young girls' dresses on escalators at the local mall by placing a bag containing a hidden video camera at their feet. It may also be true that, at the subsequent hearing on his motion to suppress, Loy claimed to have fabricated the story. But it is not true, as Loy argues, that because the evidence on this point is contradictory, the record does not support the District Court's finding.

The contradiction is of Loy's own creation. The District Court was free to conclude that the self-serving statements Loy made before the court were less credible than statements he made to third parties who he believed shared his interests in child pornography. Therefore, the record contained sufficient evidence to support the court's finding that Loy had personally made videotapes exploiting minors.

Loy next argues that even if there is sufficient evidence that he had secretly filmed up young girls' dresses on mall escalators, "that conduct would not be addressed by the condition, because the conduct would not have taken place when Mr. Loy was alone with minors." The argument is wholly without merit. The fact that Loy was willing to exploit minors in public places fully supports a condition barring him from being alone with them in private.

28

Loy further contends that the condition is vague in that it might conceivably apply to casual or unavoidable contact with minors in public places. This argument is one that has a long and familiar history in the courts; associational conditions placed upon parolees and probationers are commonplace and have frequently been challenged as overly broad or vague because they potentially extend to casual encounters. See 1 Neil P. Cohen, The Law of Probation and Parole S 9.11, at 9-19 (2d ed. 1999). At this point, it is well established that associational conditions do not extend to casual or chance meetings. See, e.g., Arciniega v. Freeman, 404 U.S. 4, 4 (1971) (per curiam) (interpreting an associational condition to exclude certain casual encounters); Birzon v. King, 469 F .2d 1241, 1243 (2d Cir. 1972) (same); Cohen, supra,S 9.11, at 9-19 (observing that associational conditions are fr equently challenged, but that courts routinely uphold them and interpret them not to apply to chance meetings). We also so interpret them. Certainly accidental or unavoidable contact with minors in public places is not forbidden by the condition; however, should Loy deliberately seek out such contacts, they would cease to be "casual" or"unavoidable" and would fall within the condition's scope. Thus, in accordance with the long line of similar cases, we believe that the condition restricting Loy's contact with minors is not unconstitutionally vague.

Loy also submits that the record does not support the District Court's finding that his wife is also interested in child pornography. Consequently, he ar gues, the court erroneously structured the condition to pr ohibit him from having otherwise unsupervised contact with minor children even if his wife is present. The court explained its order that Loy must be chaperoned by someone other than his wife when in the presence of minors as justified by the fact that "[e]vidence presented to this Court prior to defendant's sentencing indicated that defendant's wife also has an interest in child pornography." This led the court to require that "an adult other than defendant's wife must be present when defendant is in the presence of a minor ." Although the evidence on which the court based its decision is fairly tenuous for such a severe restriction, especially considering its impact on a third party who has not been charged with

29

any crime, given our deference to the District Court in factual matters, it is sufficient.9

Loy's final challenge to the condition is that, although he does not currently have children, the condition could potentially extend to any children he and his wife may subsequently have once he is released fr om prison. If so, the condition might deter him from exer cising his constitutional right to procreation, see Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and, should he have children to whom the condition applies, it would interfere with his fundamental right to familial integrity, see Gruenke v. Seip, 225 F.3d 290, 303 (3d Cir . 2000).

It is well established that, although parents have a fundamental right to raise their children, this right can be overridden by the state's "compelling inter est" in ensuring children's safety. See Croft v. W estmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997). Thus, convicted pedophiles may, quite legitimately, lose custody of their children or have restrictions placed on their parental rights. However, where there is insufficient evidence to support a finding that children are potentially in danger from their parents, the state's inter est cannot be said to be "compelling," and thus interference in the family relationship is unconstitutional. See id.  at 1126.

Loy, after approximately nine years of marriage, is childless; his term of supervised release will last only three years. At most, any children he might have upon his release would be two years old by the time the term ended. There is certainly a legitimate question as to whether the

_____

9. The only evidence that Loy's wife is inter ested in child pornography is
that, in his reply to the fake advertisement run by the police, Loy responded as "Ray and Maria" and used the word "we" to describe the interest in child pornography. However , the transcription of his telephone call with the government agent suggests that Ray did not let his wife know about his proclivities: "Umm, you know she really don't know too much about the very young stuff I got. I mean you know she kinda likes the, the couples and solo girls and stuf f. . . . But, like I said,
I kinda keep the actual really young stuf f from her because I don't know how she'd handle that. I don't know if she'd fr eak out or not. . . . I keep
that definitely hidden."

30

record would support a finding that Loy represents a threat to an infant child of his own. But it is unnecessary to decide this question, because we believe it unlikely that the District Court intended its condition to extend so far. Given the severe intrusion on Loy's family life that would otherwise result, we believe that, absent a clearer sign from the District Court, the condition should be construed to apply only to other people's children, and not to Loy's own. If, at some later date, the District Court should come to believe that it is necessary for the protection of the public or for Loy's rehabilitation to extend the condition to Loy's own children, it may consider modifications to the condition in accordance with 18 U.S.C. S 3583(e); the constitutionality of the restriction can likewise be reviewed at that time. We therefore r eject the government's suggestion that the condition receive a br oad construction now, placing the burden on Loy to petition for a modification should he and his wife have childr en before the term of supervised release ends.

V. Conclusion

For the foregoing reasons, we will affir m the condition restricting Loy's contact with minors, but will vacate the condition prohibiting Loy from possessing pornography, and remand to the District Court for further pr oceedings consistent with this opinion.

A True Copy:
Teste:

  Clerk of the United States Court of Appeals
  for the Third Circuit

31